IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

E.F.,

               Plaintiff,

      v.

CHRISTOPHER EVANS; KRISTA
TURNER; SUSAN LEMON; JANIE
BURCART; RICHARD DALL;
OREGON DEPARTMENT OF
HUMAN SERVICES (DHS); JANE
or JOHN DOE DEFENDANTS 1-5,

               Defendants.

Civ. No. 2:19-cv-01056-SU

**OPINION & ORDER**

SULLIVAN, Magistrate Judge.

This civil rights case (the "E.F. Case") and its companion case *A.F. v. Evans et al.*, Case No. 2:18-cv-01404-SU (the "A.F. Case"), come before the Court a Motion for Partial Summary Judgment filed by Plaintiff E.F. against the first affirmative defense of timeliness and the second affirmative defense of qualified immunity. ECF No. 182.  Defendants Oregon Department of Human Services ("DHS"), Christopher Evans, Susan Lemon, and Krista Turner have also filed a Motion for Partial Summary Judgment based on their second affirmative defense of qualified immunity. ECF No. 185.[1]

All parties have consented to magistrate judge jurisdiction in this case.  ECF No. 148.  The Court heard oral argument on May 26, 2021 and took the matter under advisement as of June 7,

---

[1] As discussed below, this case and the A.F. Case were consolidated for purposes of discovery and the A.F. Case was designated as the lead case for administrative control and case management purposes.  All docket entries are given as they appear in the A.F. Case docket unless otherwise noted.  Given the overlapping facts and argument, the Court issues separate but substantially similar Orders in both cases.

2021.  ECF No. 245.  For the reasons set forth below, E.F.'s Motion for Partial Summary Judgment is GRANTED and Defendants' Motion for Partial Summary is DENIED.

## FACTUAL BACKGROUND

Defendant Oregon Department of Human Services ("DHS") is the principal state agency responsible for the administration of child welfare programs in Oregon.  DHS certifies individuals to serve as foster parents and is the state agency empowered to remove children from the custody of their biological parents and to place them in foster homes.  Brothers A.F. and E.F. were, during the relevant period, under the care of DHS.

Defendant Christopher Evans is a Community Development Coordinator with DHS and was, in the relevant period, a permanency worker in the DHS office in LaGrande, Oregon.  Evans Decl. ¶¶ 1, 2.  ECF No. 186.  A permanency worker is responsible for managing a caseload of children who are in the care of DHS.  *Id.* at ¶ 2.  As a caseworker, one of Evans' responsibilities was to monitor foster homes and ensure that the children housed there are safe.  Mitchell Decl. Ex. 6, at 2.  ECF No. 183.  Defendant Susan Lemon was, during the relevant time, a certifier with DHS.   Lemon Decl. ¶ 1.  ECF No. 187.  Defendant Krista Turner was the DHS supervisor for Evans and Lemon.  Rizzo Decl. Ex. 1, at 2-3 ("Evans Depo."); Rizzo Decl. Ex. 2, at 22-23 ("Lemon Depo.").  ECF No. 145.

Evans was assigned as the permanency worker for A.F. and E.F. on November 15, 2012.  Evans Decl. ¶ 5.  At the time, A.F. was eight years old and E.F. was ten years old.  *Id.* at ¶ 5.  A.F. and E.F. were among the first cases assigned to Evans when he became a permanency worker.  Rizzo Decl. Ex. 1, at 23.  When Evans first met A.F. and E.F., "the boys' lives had been very difficult and completely unstable."  Evans Decl. ¶ 5.  Their parents had significant criminal histories, including periods of incarceration, and both parents were addicted to drugs.  *Id.*  A.F.

and E.F. had lived intermittently with each of their parents and with various domestic partners of each parent. *Id.* During that time, A.F. and E.F. had been physically abused by their father and exposed to drug activity on multiple occasions. *Id.*

When Evans was assigned as caseworker for A.F. and E.F., the boys were living with their father, Dustin Fitzgerald. Evans Decl. ¶ 6. DHS became involved "because the father's legal problems threatened to interfere with his care of the children." *Id.* During this time, Dustin Fitzgerald failed a drug test and drug paraphernalia was discovered in the home, which resulted in DHS taking physical custody of A.F. and E.F. *Id.*

At the recommendation of the boys' paternal grandfather, John Fitzgerald, the boys were temporarily placed with a woman named Becki Smith. Evans Decl. ¶ 7. At the time, Smith was in a relationship with John Fitzgerald. *Id.* After a week with the boys in Smith's care, John Fitzgerald reported to DHS that Smith was an opiate addict. *Id.* John Fitzgerald told DHS that he had known of Smith's addiction at the time of his recommendation, but "hadn't mentioned Becki's opiate problem when he referred her to the agency, because he thought he could control the issue as long as he and Becki were in a relationship." *Id.* Evans affirms that "[t]he fact that Fitzgerald had not been candid with DHS on an issue as important as the safety of his grandchildren impacted all my dealings with John Fitzgerald thereafter," and "[a]t several points during the case of AF and EF, John Fitzgerald's statements were less than credible and his ability to act in the best interests of the children was not clear." *Id.*

DHS removed the children from Smith's care and temporarily placed them with John Fitzgerald and his spouse, Jodi. Evans Decl. ¶ 8. Citing his wife's poor health, John Fitzgerald initially declined to be a permanent resource for A.F. and E.F., going so far as to insist that they be removed by a specific date. *Id.* By early 2013, A.F. and E.F. were still living with their

grandfather and John Fitzgerald had wavered in his conviction that he would not be a permanent resource for the boys. *Id.* at ¶ 9. "John Fitzgerald waffled several times about whether he could foster the boys or be a guardian long term." *Id.* Evans testified that he believed John Fitzgerald loved his grandsons and that they loved and were attached to him. Rizzo Decl. Ex. 1, at 14-15.

In February 2013, DHS hosted a meeting for the boys' family "to try to chart a path for AF and EF's care." Evans Decl. ¶ 10. On February 15, 2013, the family recommended that the boys' uncle, Derric Campbell, become their foster parent with support from other family members. *Id.*

When Campbell was first contacted by DHS, he expressed concern about his ability to financially support A.F. and E.F. Rizzo Decl. Ex. 1, at 35. At the time, Campbell worked at a fast-food restaurant and did not believe he could afford to care for his nephews. Mitchell Decl. Ex. 12, at 8. Campbell was twenty-six years old and had no prior childcare experience. Rizzo Decl. Ex. 1, at 38; Mitchell Decl. Ex. 10. Campbell had grown up in an abusive home and Campbell's stepfather had sexually abused Campbell's half-sisters. Lemon Decl. ¶ 4. Dustin Fitzgerald testified that both he and Campbell had been physically and emotionally abused by their stepfather. Mitchell Decl. Ex. 3 ("Dustin Fitzgerald Depo."), at 2-3. At the time, Campbell's sisters were taken into DHS care. Rizzo Decl. Ex. 2, at 11. DHS and Lemon were aware of Campbell's family history during the certification process. Rizzo Decl. Ex. 2, at 13-14.

Campbell told Evans that he had experienced suicidal ideation in the past, although they did not discuss Campbell's history of abuse. Rizzo Decl. Ex. 1, at 10-11. Campbell's medical records show that he attempted suicide in 2010 and reported to his medical providers that he had tried to commit suicide on at least two prior occasions. Mitchell Decl. Ex. 11, at 1. Lemon was aware of Campbell's mental health issues during his certification process and knew that he was not in mental health counseling at the time of his certification. Mitchell Decl. Ex. 1, at 25-26.

In the days and weeks following the February 15, 2013 meeting, the family's support for placing the boys with Campbell waned. Evans Decl. at ¶ 10. John Fitzgerald, in particular, came to oppose the plan to place the boys with Campbell and asserted that Campbell suffered from HIV. *Id.* at ¶¶ 10, 13. Campbell was openly gay and "[s]everal incidents during the agency's interaction with John Fitzgerald gave rise to concerns that some of the issues the family had with Campbell's care were related more to opposition to Campbell's sexual orientation than any real issues with the care he provided or his conduct." *Id.* at ¶¶ 11-12.

During the February 2013 meeting, the family decided that Campbell should live and provide foster care for the boys in a mobile home owned by the boys' father, Dustin Fitzgerald. Evans Decl. ¶ 14. Campbell, A.F., and E.F. would have shared the mobile home with the boys' father's half-sister, her boyfriend, and her infant child. *Id.* When Campbell reported problems about this living arrangement to DHS, John Fitzgerald threatened to evict everyone from the mobile home. *Id.*

During the process of certifying Campbell to serve as a foster parent, Campbell was ultimately evicted but he was able to secure new housing through a federal program. Lemon Decl. ¶ 5. Evans assisted Campbell in applying for housing by writing to the housing authority on Campbell's behalf. Rizzo Decl. Ex. 1, at 18-19. Without that assistance, Campbell would not have been eligible for housing. *Id.* Evans also provided Campbell with kitchenware, donated by Evans's parents. *Id.* at 20-21. DHS provided Campbell with money to pay for the deposit for the new house, as well as other household goods. Rizzo Decl. Ex. 1, at 47-48. Evans testified that Campbell would not have been able to provide those goods without DHS assistance. *Id.* at 48. On May 30, 2013, Lemon issued an emergency certification of Campbell as a foster parent in order to carry out the boys' immediate placement with Campbell. Rizzo Decl. Ex. 2, at 60. On May 30,

2013, Evans and Turner collected the boys from school and transported them to be placed with Campbell. Rizzo Decl. Ex. 1, at 47; Ex. 2, at 68-69; Ex. 3, at 40; Ex. 7 at 11-12. Campbell was certified as a foster parent by DHS on July 17, 2013. Rizzo Decl. Ex. 19, at 1.

During the time the boys were in Campbell's care, John Fitzgerald reported to DHS that Campbell was "unstable." Evans Decl. ¶ 15. "Without specific information to investigate, DHS had to make a judgment on what was credible," and, in light of John Fitzgerald's earlier attempts to mislead DHS, the agency found his report not credible, "particularly since the case workers dealing with Campbell had found him more stable than other members of the family." *Id.*

There were concerning reports about Campbell's conduct as the caregiver for the boys. John Fitzgerald reported that Campbell had "discussed a sex act in front of the children." Evans Decl. ¶ 16. A.F. reported to Evans that Campbell had discussed, in front of the boys, sex acts and wanting to commit suicide. Rizzo Decl. Ex. 1, at 45. "Although any discussion of adult topics in the presence of children is inappropriate, it was the judgment of the agency that the event did not impact Campbell's ability to foster, in light of his explanation and the source of the information." Evans Decl. ¶ 16.

Both A.F. and E.F. expressed a preference for living with their grandfather, rather than continuing to live with Campbell. Mitchell Decl. Ex. 12, at 2, 7. E.F. reported to Evans that he had been called demeaning names by Campbell and that E.F. was contemplating running away or committing suicide rather than continuing to live with Campbell. Rizzo Ex. 1, at 53-54. Evans responded to E.F. that DHS did not intend to move the boys again. *Id.* at 54.

Evans received reports that A.F. and E.F. were sleeping in Campbell's bed with Campbell on a nightly basis. Rizzo Decl. Ex. 1, at 51. Evans testified that he received these reports in September 2013. Mitchell Decl. Ex. 2, at 7-8. Lemon testified that such conduct would not be

acceptable in a foster parent.  Rizzo Decl. Ex. 2, at 10.  A.F. and E.F. did not sleep or ask to sleep in the beds of their prior foster care providers.  Rizzo Decl. Ex. 26; Ex. 27.

On August 23, 2013, Campbell self-reported that he had spanked E.F. in contravention of DHS policy forbidding the use of physical discipline by foster parents.  Evans Del. ¶ 17.  Evans discussed the issue with Campbell and then with his supervisors and "it was determined by the agency that Campbell's foster care could continue."  *Id.*  "Campbell was instructed by agency management that using physical discipline was inappropriate and agreed to work with the children's counselor to employ collaborative problem-solving tools."  *Id.*

In March 2014, Evans received a voicemail message from E.F.'s school principal, relaying a report from E.F. that Campbell "argues, loses his temper, name calls, swears, throws things, has held [A.F.] down, and has spanked him."  Rizzo Decl. Ex. 1 at 59-60.  Evans testified that he did not know if he wrote the report down in his case notes or if it was reported to the juvenile dependency court.  *Id.* at 61-62.  The report was not treated as a child protective services investigation.  *Id.*  In addition to calling the boys names, Evans also received reports that Campbell had placed restrictions on the boys' access to food.  Mitchell Decl. Ex. 2, at 2.

Evans affirms that he met with A.F. at least thirty-six times during the period when A.F. was in foster care.  Evans Decl. ¶ 18.  A.F. was told that he should report any problems or anything inappropriate to Evans.  *Id.*  A.F. never reported to Evans that he had been inappropriately or sexually touched.  *Id.*

In June 2014, Evans signed an affidavit in support of A.F. and E.F. being placed in a permanent guardianship with Campbell and DHS's custody of the boys being terminated.  Mitchell Decl. Ex. 9.  In that affidavit, Evans affirmed that A.F. had an "excellent" relationship with Campbell and had done "very well in his care."  Mitchell Decl. Ex. 9, at 2.  In July 2014, the

Oregon circuit court approved Campbell as a permanent guardian for A.F. and E.F.  Mitchell Decl. Ex. 13, at 3-4.

In January 2016, A.F. disclosed that he had been sexually abused by Campbell. Rizzo Decl. Ex. 24, at 5-9; Ex. 28, at 2-3.  In February 2016, the state court terminated Campbell's guardianship and the boys were returned to the care of their father.  Mitchell Decl. Ex. 13, at 3.

In March 2016, Campbell was indicted for sexual abuse of A.F.  Rizzo Decl. Ex. 29, at 3. Campbell committed suicide while the charges against him were pending.  Rizzo Decl. Ex. 1, at 13; Ex. 30, at 5.

## PROCEDURAL HISTORY

The A.F. Case was filed on July 26, 2018.  ECF No. 1.  In addition to the moving Defendants, A.F. also named Janie Burcart and Richard Dall, former attorneys for A.F. and E.F., as Defendants.  The E.F. Case was filed on July 5, 2019.  ECF No. 1 in the E.F. Case.  On July 29, 2019, Burcart filed an unopposed motion to consolidate the two cases for purposes of discovery. ECF No. 69.  The Court granted Burcart's motion and the cases were consolidated for discovery on August 2, 2019.  ECF No. 70.  The earlier-filed A.F. Case was designated as the "lead case" for administrative purposes.

Both A.F. and E.F. reached a negotiated settlement with Burcart and Dall in an agreement approved by Judge Michael McShane on September 28, 2020.  Consistent with the terms of that settlement agreement, the Court granted a motion to dismiss all claims against Burcart and Dall with prejudice on October 9, 2020.  ECF No. 180.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

### II.    Qualified Immunity

Defendants have raised the defense of qualified immunity in support of their motions for partial summary judgment.  A defendant is entitled to qualified immunity if his or her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald¸* 457 U.S. 800, 818 (1982).  The qualified immunity analysis requires a court to address two questions: (1) whether the facts alleged or shown by the

plaintiff establish a constitutional violation and (2) whether the right at issue was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The right must have been clearly established at the time of the defendant's alleged misconduct, so that reasonable official would have understood that what he or she was doing under the circumstances violated that right. *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Courts have discretion in deciding which prong to address first, depending on the circumstances of the case. *Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009).

The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks and citation omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks and citation omitted, emphasis in original). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks and citations omitted).

Even if a right is clearly established, qualified immunity protects an official from reasonable mistakes about the legality of his actions. *Wilkins v. City of Oakland*, 350 F.3d 949, 954-55 (9th Cir. 2003). The official is still entitled to qualified immunity if the official "could have believed, 'reasonably but mistakenly . . . that his or her conduct did not violate a clearly established constitutional right.'" *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006) (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of

law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted).

## DISCUSSION

In his Second Amended Complaint ("A.F. SAC"), ECF No. 222, A.F. brings claims for deprivation of his civil rights against Evans, Lemon, and Turner pursuant to 42 U.S.C. § 1983, as well as state law claims for negligence and negligence *per se* against DHS.    E.F.'s Second Amended Complaint ("E.F. SAC"), ECF No. 189 in the E.F. Case, likewise alleges claims for deprivation of civil rights against Evans, Lemon, and Turner pursuant to 42 U.S.C. § 1983 and state law claims for negligence and negligence *per se* against DHS.

In their Answer to the A.F. SAC, ECF No. 227, Defendants assert several affirmative defenses, two of which are relevant to the cross motions for summary judgment: (1) Defendants assert that A.F. failed to commence the case within the time limited by statute, A.F. Ans. ¶ 37; and (2) that the individual Defendants are entitled to qualified immunity, A.F. Ans. ¶ 38.    In their Answer to the E.F. SAC, ECF No. 197 in the E.F. Case, Defendants raise the same affirmative defenses of timeliness and qualified immunity.    E.F. Ans. ¶¶ 43-44.

Both A.F. and E.F. move for summary judgment on the defenses of timeliness and qualified immunity.    The individual Defendants have also moved for summary judgment on the basis of qualified immunity in both cases.    As noted, the two cases have a near-total factual overlap and involve substantially the same legal arguments and, in briefing their motions, the parties have freely cited to one another's exhibits and incorporated one another's arguments.    For the sake of efficiency, the Court will likewise cite to the exhibits offered by A.F., E.F., and Defendants in resolving all of the pending motions.

## I.    Timeliness

Defendants assert that A.F. and E.F.'s claims are time-barred because they are based on conduct that occurred more than two years before the commencement of this action.  In assessing this issue, it is necessary for the Court to distinguish between the claims brought against the individual Defendants under 42 U.S.C. § 1983 and the claims for negligence and negligence *per se* against DHS itself, which are brought pursuant to the Oregon Tort Claims Act ("OTCA").

### A.  Claims brought under § 1983

As to the claims against the individual Defendants, § 1983 "contains no specific statute of limitations, and therefore federal courts apply the forum state's statute of limitations for personal injury actions." *Johnson v. Spivey*, No. 3:16-cv-00620-SB, 2018 WL 3468482, at *9 (D. Or. July 18, 2019) (citing *Maldonado v. Harris*, 370 F.3d 945, 954-55 (9th Cir. 2004)).  In Oregon, the applicable statute of limitations for a § 1983 claim is two years from the date upon which the cause of action accrues.  *Id.*; ORS 12.110(1).  In cases of minority, federal courts will "also borrow the 'related' tolling statute, [ORS] 12.160."  *Bonneau v. Centennial Sch. Dist. No. 28J*, 666 F.3d 577, 580 (9th Cir. 2012).  ORS 12.160(1) provides that if, "at the time the cause of action accrues the person is a child who is younger than 18 years of age, the statute of limitations for commencing the action is tolled for so long as the person is younger than 18 years of age."  "The time for commencing an action may not be extended under subsection (1) of [ORS 12.160] for more than five years, or for more than one year after the person attains 18 years of age, whichever occurs first."  ORS 12.160(2).  In other words, a minor plaintiff has up to seven years after the date of the injury in which to file their claims.  *See Christiansen v. Providence Health Sys. of Ore. Corp.*, 344 Or. 445, 451-52 (2008) ("ORS 12.160 extends that two-year period for an additional five years during the child's minority.").

In this case, A.F. and E.F.'s claims would have begun to accrue no earlier than 2013 when Defendants made the decision to place the boys with Campbell.  A.F. and E.F. were minors at all relevant times and so their § 1983 claims are subject to the tolling provisions of ORS 12.160.  A.F. initially filed the A.F. Case on July 26, 2018 and E.F. filed the E.F. Case on July 5, 2019, well within the limitation period provided by ORS 12.110, as tolled by the provisions of ORS 12.160. Both A.F. and E.F.'s claims under § 1983 are therefore timely and the Court GRANTS both A.F. and E.F.'s motions for summary judgment as to the individual Defendants' affirmative defense of timeliness.

### B.  Claims under the OTCA

A.F. and E.F.'s claims for negligence and negligence *per se* are alleged against DHS itself. DHS is a public entity and, as such, claims against it are subject to the limitations provided by the OTCA.  ORS 30.265(2).  Among other limitations, the OTCA provides:

> Except as provided in ORS 12.120, 12.135 and 659A.875, but notwithstanding any other provision of ORS chapter 12 or other statute providing a limitation on the commencement of an action, an action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of ORS 30.260 or 30.300 shall be commenced within two years after the alleged loss or injury.

ORS 30.275(9).

Defendants contend that the boys' injuries occurred more than two years before the commencement of this case and so their claims against DHS are time-barred.  The Oregon Court of Appeals has held, however, that because ORS 12.160 "does not provide a limitation on the commencement of an action but instead provides for tolling the time allowed for the commencement of an action," a claim against a public body under the OTCA is still subject to tolling under ORS 12.160.  *Smith v. Ore. Health Sci. Univ.*, 272 Or. App. 473, 486 (2015).  As set

forth in the previous section, A.F. and E.F. commenced their actions with the requisite two-year statute of limitations, as tolled for their minority under ORS 12.160.

Even if the tolling provisions of ORS 12.160 did not apply, the boys' claims would still be timely under ORS 12.117, which provides:

> Notwithstanding ORS 12.110, 12.115 or 12.160, an action based on conduct that constitutes child abuse or conduct knowingly allowing, permitting or encouraging child abuse that occurs while the person is under 18 years of age must be commenced before the person attains 40 years of age, or if the person has not discovered the causal connection between the injury and the child abuse, nor in the exercise of reasonable care should have discovered the causal connection between the injury and the child abuse, not more than five years from the date the person discovers or in the exercise of reasonable care should have discovered the causal connection between the child abuse and the injury, whichever period is longer.

ORS 12.117(1).

Defendants do not dispute that A.F. and E.F.'s claims against DHS would fall within the definition of child abuse set forth in ORS 12.117(2), but, as with ORS 12.160, Defendants contend that the tolling provisions of ORS 12.117 do not apply to claims against public bodies and that the boys' claims are subject to the un-tolled two-year limitations period of ORS 30.275(9). During the pendency of this motion, the Oregon Supreme Court issued a decision rejecting this very argument and holding that the tolling provisions of ORS 12.117 apply to all claims for child abuse, whether made against public bodies or private entities. *Sherman v. State*, 368 Or. 403, 414-19 (2021).

Consistent with the Oregon Supreme Court's decision in *Sherman* and the Oregon Court of Appeals' decision in *Smith*, the Court concludes that A.F. and E.F.'s claims against DHS are timely, whether tolled for minority under ORS 12.160 or under the child abuse-specific tolling provisions of ORS 12.117. E.F.'s Motion for Partial Summary Judgment is therefore GRANTED as to the affirmative defense of timeliness.

## II.     The Individual Defendants and Qualified Immunity

Defendants claim that each of the individual Defendants is entitled to qualified immunity as to A.F. and E.F.'s claims under §1983 and the boys challenge this affirmative defense in their cross-motions for summary judgment.  Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).  To maintain a claim under § 1983, "a plaintiff must both (1) allege the deprivation of a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

In this case, A.F. and E.F.'s claims against the individual Defendants arise under the Due Process Clause of the Fourteenth Amendment arising from the individual's placement of the boys with Campbell.  "Generally, the Fourteenth Amendment's Due Process clause does not confer any affirmative right to governmental aid and typically does not impose a duty on the state to protect individuals from third parties."  *Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) (internal quotation marks and citations omitted, alterations normalized).

> There are, however, two exceptions to this rule.  First, there is the "special relationship" exception—when a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and well-being.  Second, there is the "state-created danger exception"—when the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known and obvious danger.  If either exception applies, a state's omission or failure to protect may give rise to a § 1983 claim.

*Henry A.*, 678 F.3d at 998 (internal quotation marks and citations omitted).

In this case, the boys allege that both the special relationship exception and the state-created danger exception apply.  A.F. and E.F. allege that a special relationship existed between themselves and the individual Defendants, arising out of the boys' placement in foster care.  A.F.

and E.F. also allege that the individual Defendants acted with deliberate indifference to the known and obvious danger to the boys posed by Campbell.  The allegations must be considered in the context of each individual Defendant, but first the Court must sketch out the contours of these claims, both of which require a showing of deliberate indifference.

### 1. Special Relationship Exception

When "the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).  "When the State asserts this type of custody over a person 'and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by . . . the Due Process clause.'" *Henry A.*, 678 F.3d at 1000 (quoting *DeShaney*, 489 U.S. at 200).

"It is also clearly established that this special relationship doctrine applies to children in foster care." *Henry A.*, 678 F.3d at 1000.  "Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992).  This right encompasses "a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent." *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010).

The "proper standard for determining whether a foster child's due process rights have been violated is deliberate indifference." *Henry A.*, 678 F.3d at 1000 (internal quotation marks and citation omitted).  "This standard requires an objective risk of harm and a subjective awareness of that harm." *Id.* at 1000-01.

> To be more specific, it requires (1) a showing of an objectively substantial risk of harm; and (2) a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and (a) the official actually drew that inference or (b) that a reasonable official would have been compelled to draw that inference.  The subjective component may be inferred from the fact that the risk of harm is obvious.

*Henry A.*, 678 F.3d at 1001 (internal quotation marks and citations omitted, alterations normalized).

The Ninth Circuit has held that it clearly established "that a foster child's due process rights are violated when a state official exhibits deliberate indifference to a child's serious medical needs; to suspected physical abuse in a foster home; and to suspected sexual abuse in a foster home." *Henry A.*, 678 F.3d at 1001.

### 2.  State-Created Danger Exception

State actors can also be held liable under the Fourteenth Amendment's Due Process Clause for failing to protect an individual from harm by third parties "where the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced."  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting *DeShaney*, 489 U.S. at 197, 201).  "To determine whether an official affirmatively placed an individual in danger, we ask: (1) whether an affirmative action of the official placed the individual in danger he otherwise would not have faced; (2) whether the danger was known or obvious; and (3) whether the officer acted with deliberate indifference to that danger."  *Henry A.*, 678 F.3d at 1002.  The Ninth Circuit has held that "the state created danger doctrine applies to placing a foster child in a home where there is a known danger of abuse," and that it extends to the licensing of foster homes.  *Id.* at 1003.

### 3. Persistent violation of statutory and regulatory duties

In assessing a claim of deliberate indifference, under either the special relationship exception or the state-created danger exception, courts within this district have held that "under a deliberate indifference analysis, a defendant may be 'charged with knowledge of unconstitutional conditions when they persistently violated a statutory duty to inquire about such conditions and to be responsible for them.'"  *A.G. v. Ore. Dep't of Human Servs.*, No. 3:13-CV-01051-AC, 2015 WL 5178707, at *4 (D. Or. Sept. 3, 2015) (quoting *Doe v. N.Y. City Dep't of Soc. Servs.*, 649 F.2d 134, 145 (2nd Cir. 1981)).  This standard did not impose strict liability for failure to perform statutory duties, but instead "'allowed for an inference of unconcern for plaintiffs' welfare from a pattern of omissions revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse.'"  *Id.* (alterations normalized).  As Judge Acosta summarized:

> Reasonable government officials should be aware of the risk created if they persistently violate statutory and regulatory duties imposed upon them, particularly when those duties are meant to protect the well-being of foster children in the state's care.  A reasonable official would understand that failure to fulfill those duties could result in a substantial risk of serious harm.  Therefore, in determining whether Plaintiff's adequately alleged deliberate indifference, the court will apply *Doe* to determine whether Plaintiffs satisfy the subjective element by alleging a particular defendant engaged in a persistent practice of ignoring legal duties imposed upon him or otherwise failed to perform [ ] statutory and regulatory duties intended to protect the Plaintiffs.

*Id.* at *5.

Although, as Defendants have pointed out, *A.G.* was decided in 2015 and therefore after the events giving rise to A.F. and E.F.'s claims, it was not decided in a vacuum, nor did it announce any new rule of law.  In reaching its conclusion, the court in *A.G.* relied upon *Henry A.*, *Tamas*, and the Second Circuit's decision in *Doe* in framing its explanation of deliberate indifference through "persistent violation" of statutory and regulatory duties aimed at protecting children taken into DHS care.  *See, A.G.*, 2015 WL 5178707, at *5 ("Although the Ninth Circuit did not adopt or

specifically mention the 'persistent violation' rule, it cited *Doe* for a related proposition. Moreover, the *Doe* court's holding flows naturally from the Ninth Circuit's conclusion in *Tamas* that the subjective element of a deliberate indifference claim may be satisfied where the Plaintiff shows a 'reasonable official would have been compelled to draw' the inference that a substantial risk of serious harm existed.").  The Court reaches the same conclusion here—A.F. and E.F. may support their claims of deliberate indifference by showing a persistent pattern of violation of regulatory duties by the individual Defendants where those duties are intended to shield children like A.F. and E.F. from harm.   Under *Tamas*, the persistent pattern of violations goes to the subjective element of deliberate indifference and what inferences a reasonable official would have drawn in those circumstances.  The Court need not rely on *A.G.*, however, because the principles articulated by Judge Acosta in *A.G.* are simply an application of *Tamas*, and such principles were well-established at the time of the conduct challenged in the present case.

### A.  Evans

Evans was the DHS caseworker assigned to A.F. and E.F. and served as their primary point of contact with the agency.  His duty was to monitor the safety and well-being of the children by maintaining ongoing contact with the children and the foster parent and documenting those contacts.  Rizzo Decl. Ex. 1, at 25-26.

Evans knew that Campbell did not have a home after he was evicted from the trailer.  Rizzo Decl. Ex. 1, at 19-20.  Evans helped Campbell get housing through a public affordable housing organization by writing letters to the housing authority.   Rizzo Decl. Ex. 1, at 18-20, 27. Campbell's receipt of housing was conditional upon his having the children in his care and he was otherwise ineligible for the housing.  Rizzo Decl. Ex. 1, at 19, 27; Ex. 9.  Evans and Turner worked to furnish Campbell with basic household items, which both admitted was an unprecedented level

of housing assistance.  Rizzo Decl. Ex. 1, at 20-21, 21-22, 47-48; Ex. 3 ("Turner Depo.") at 24-29; Ex. 10, Ex. 11.  At this point, Campbell had not yet been certified as a foster parent.  Rizzo Decl. Ex. 3, at 25.

In the course of the relationship, Campbell disclosed to Evans that he had been sexually abused as a child, but Evans did not include the fact of Campbell's abuse in his case notes.  Rizzo Decl. Ex. 1, at 8-9.

When the boys moved in with Campbell, they were not allowed to go outside or eat food when Campbell was not present.  Mitchell Decl. Ex. 4 ("E.F. Depo."), at 3.  ECF No. 136.  Campbell would mark food containers to ensure that the boys were not eating without his permission and limited the boys to one bologna sandwich per meal.  E.F. Decl. ¶ 3, ECF No. 201.  The boys would be punished for opening the fridge outside of Campbell's presence; eating without permission; sneezing or coughing outside of their rooms; or getting up at night for water or to use the restroom.  *Id.* at ¶¶ 4-5.  E.F. affirms that he was "always hungry" when he lived with Campbell and lost a significant amount of weight.  *Id.* at ¶ 4.  It is not clear whether the full extent of these allegations were known to Evans, but Evans testified that he knew Campbell overreacted to the boys' behavior and would restrict their food intake.  Rizzo Decl. Ex. 1, at 5.

In his deposition, E.F. testified that he experienced multiple instances of physical abuse by Campbell, including episodes where Campbell struck him with a belt and with his hands.  Mitchell Decl. Ex. 4, at 4-5.  E.F. also testified that Campbell would squeeze E.F.'s arm to cause pain or pull him around by his arm and that this happened "fairly regularly." *Id.* at 5-7.  Campbell would also crack the belt and threaten to hit E.F. with it.  *Id.* at 8.  E.F. affirms that, in another incident, Campbell struck him in the face with the front and back of his hand and then pulled E.F. to his feet, choking him.  E.F. Decl. ¶ 9.  In yet another incident, E.F. reports that Campbell burned E.F.'s

face with a lighter.  *Id.* at ¶ 10.   In his deposition, E.F. testified that he reported incidents of abuse to Evans.  Mitchell Decl. Ex. 4, at 9.  E.F. saw Campbell deny the incident to Evans and decided "from then, whatever, like what I said, it just didn't matter anymore."  *Id.* at 10; *see also* Mitchell Decl. Ex. 4, at 11 (E.F. testified that telling Evans about being struck by Campbell "didn't do anything.").   E.F. also disclosed to Evans that Campbell would get angry and call the boys names and that E.F. had considered running away.  Rizzo Decl. Ex. 4, at 1-2; E.F. Decl. ¶¶ 12-13.

On August 19, 2013, Campbell emailed Evans to disclose that he had "pushed" E.F.'s arm away and had "swatted" E.F.'s hand twice.  Rizzo Decl. Ex. 22; Ex. 1, at 55-56.  Evans thanked Campbell and told him that he would be "prepared" in case the incident came up.  Rizzo Decl. Ex. 22.  On August 23, 2013, Campbell admitted to Evans that he had in fact spanked E.F. during the incident.  Rizzo Decl. Ex. 1, at 56-58; Ex. 4, at 1-2.  Evans knew that physical discipline violated DHS rules for foster parents and that Campbell had minimized the extent of his use of physical discipline.  Rizzo Decl. Ex. 1, at 56, 58.

In September 2013, Evans learned that Campbell and A.F. were sleeping in the same bed.  Rizzo Decl. Ex. 1, at 51-52.  Lemon testified that Evans did not pass that fact along to her but that a child sleeping in a foster parent's bed would be a safety concern and a "pretty serious certification violation."  Rizzo Decl. Ex. 2, at 82-83.  A.F. had never slept in the bed with any of his prior foster parents, including his grandfather.  Rizzo Decl. Ex. 26; Ex. 27.

In his deposition, John Fitzgerald testified that Campbell would lock himself in his room for extended periods of time and that, on one occasion, John Fitzgerald broke down Campbell's bedroom door because he believed Campbell was dead.  Second Mitchell Decl. Ex. 2 ("John Fitzgerald Depo."), at 2-3, ECF No. 202.  John Fitzgerald testified that he reported the incident to Evans.  Second Mitchell Decl. Ex. 2, at 3-4.

On March 13, 2014, a principal at E.F.'s school contacted DHS and Evans to report that E.F. had disclosed that Campbell "argues, loses his temper, name calls, swears" and "throws things," and Campbell "has held [A.F.] down and spanked him." Rizzo Decl. Ex. 1, at 58-61. Standard practice for a DHS caseworker would be to refer such a report to the child abuse hotline for a CPS assessment of child safety. Rizzo Decl. Ex. 23 ("Brenda Leavitt Depo."), at 2-3, 4-5; Ex. 24, at 2-4. Evans did not make a child abuse report or refer the matter to CPS for investigation, nor did he disclose the report to the judge presiding over the boys' dependency cases. Rizzo Decl. Ex. 1, at 59-62. Evans did pass along the report to Turner, noting that he planned to speak with E.F. and "then put he and [Campbell] together and try and resolve this." Mitchell Decl. Ex. 19. Evans also asked A.F. about E.F.'s report to his school and A.F. "described that these things occurred in the past, and in instances where [E.F.] was out of control or was arguing with [Campbell] at home." Mitchell Decl. Ex. 12, at 1.

In sum, Evans was aware of numerous "red flags" concerning Campbell's capacity and performance as a foster parent, including his history of sexual abuse; his lack of financial resources and appropriate housing; his discussion of inappropriate sexual topics and suicide with the boys; Campbell's own admission of using physical discipline on E.F.; the fact that A.F. and Campbell were sleeping in the same bed together; and alarming reports relayed to him by the boys' school. Evans did not inform the state court or CPS of the concerning information he received about Campbell. Evans also discounted reports about Campbell made by other members of the boys' family. Evans points out that A.F. did not report abuse by Campbell. However, the Ninth Circuit has held that "the law does not impose the duty of guarding on their own safety on wards of the state." *Tamas*, 630 F.3d at 843. "Rather, that duty is the quintessential responsibility of the social workers assigned to safeguard the well-being of this helpless and vulnerable population." *Id.* It

was Evans' duty to ensure the boys' safety and not the responsibility of the boys to look out for themselves.

On this record, the Court concludes that Campbell posed an objective danger to A.F. and E.F. and that Evans was subjectively aware of facts that would have led a reasonable official to know about the danger for purposes of establishing deliberate indifference under either the special relationship or the state-created danger exception.  The Court likewise concludes that the contours of the right were sufficiently well-established at the time of Evans's actions, giving particular attention to the guidance of *Henry A.*, which established the parameters of a child's due process rights while in DHS custody with some particularity, and *Tamas*, which expressly extended those protections to include harms done to the child by a foster parent.  The Court, therefore, concludes Evans is not entitled to the protections of qualified immunity regarding the claims filed by E.F.

### B.  Lemon

As previously noted, Lemon was a certifier for DHS and is the official who certified Campbell as an approved foster parent for A.F. and E.F.  "The purpose of the foster parent certification process is to ensure to the greatest extent possible that foster children are placed with foster parents who are emotionally and fiscally stable, properly trained, temperamentally suited, and otherwise capable of caring for their young wards." *A.G.*, 2015 WL 5178707, at *5.  DHS has promulgated administrative rules to describing the criteria for approving applicants as foster parents and for maintaining that certification.  Rizzo Decl. Ex. 16.  All foster care applicants must meet DHS certification standards to become certified.  Rizzo Decl. Ex. 2, at 21, 24-25.  It was also impermissible for DHS to furnish an applicant with the conditions necessary to meet the certification requirements they would not otherwise have been able to meet.  Rizzo Decl. Ex. 2, at 39-40.

Lemon was the official responsible for evaluating whether Campbell met the certification requirements. Rizzo Decl. Ex. 2, at 33-34. As part of the process, Lemon was required to use the Structured Analysis Family Evaluation Home Study ("SAFE Study") method, which is a tool relied upon by DHS to ensure that all persons are certified according to the certification standards. Rizzo Decl. Ex. 2, at 28-29; Ex. 17 ("Billy Cordero Decl."), at 6. SAFE is intended to elicit information from potential foster parents that could be concerning and to direct the assessment inquiry. Rizzo Decl. Ex. 2, at 91. The failure to correctly apply the SAFE methodology can affect child safety and certifiers are not permitted to ignore or overlook concerns in the analysis. Rizzo Del. Ex. 2, at 46; Ex. 3, at 10.

Lemon was therefore required to assess Campbell's ability to provide for the boys' safety and ensure that Campbell could meet the boys' needs. Rizzo Decl. Ex. 2, at 24-25. Campbell was required to "participate in the home study process that includes a comprehensive inquiry into the applicant's personal and family history and family dynamics." Rizzo Decl. Ex. 2, at 45-46. In this inquiry, Campbell bore the burden of demonstrating that he had the qualifications to be certified as a foster care provider. Rizzo Decl. Ex. 2, at 33-34, 35-36.

The SAFE Study required Lemon to evaluate, among other things, Campbell's history of childhood trauma, deprivation, and victimization, relative to his ability to safely parent. Rizzo Decl. Ex. 2, at 2-4, 10. Campbell's family history contained incidents of serious abuse against Campbell's sisters and Campbell himself and Lemon was aware of that history because she had been one of the caseworkers assigned to Campbell's sister in that case. Rizzo Decl. Ex. 2, at 11, 91-92. This history was also disclosed to Lemon in Campbell's foster parent certification packet in February 2013. Rizzo Decl. Ex. 2, at 11-16, 91-92. Despite this awareness, Lemon never asked Campbell about his history of abuse, or about whether he had had mental health treatment to

process the abuse.  Rizzo Decl. Ex. 2, at 15-16, 50, 54-57, 63.  In her report, Lemon marked areas related to "family functioning" as a "4," indicating "serious concern."  Mitchell Decl. Ex. 13, at 2; Ex. 15, at 1.  But Lemon's SAFE Study made no mention of Campbell's family history of abuse. Rizzo Decl. Ex. 2, at 63.

In order to be certified, Campbell was required to demonstrate that he had the ability to manage his home and personal life.  Rizzo Decl. Ex. 16, at 13; Ex. 2, at 34, 37-38.  Lemon was aware that Campbell did not have a home of his own when he was put forward as a foster parent for the boys.  Rizzo Decl. Ex. 2, at 37-38.  Lemon also knew that Campbell would not have been able to afford a three-bedroom home on his income and assumed he was receiving family support. Rizzo Decl. Ex. 2, at 44.

Campbell was also required to demonstrate that he had adequate financial resources to support the household independent of the monthly foster care payments.  Rizzo Decl. Ex. 16, at 13; Ex. 2, at 34, 42.  Campbell's financial disclosure form contained clear discrepancies and showed a lack of financial resources.  Rizzo Decl. Ex. 19, at 2.  Lemon relied on Campbell's report and did not receive collateral information about Campbell's finances.  Rizzo Decl. Ex. 2, at 43-44.

Potential foster parents are required to complete a DHS training program consisting of eight three-hour sessions entitled "Child Welfare Foundations."  Rizzo Decl. Ex. 2, at 5, 7.  These sessions include training on the effect of trauma and sexual abuse on child development and on applying appropriate discipline.  Rizzo Decl. Ex. 5-6.  Lemon knew that Campbell did not undergo this training because "for whatever reason he was unable to attend the sessions that were offered at the time."  Rizzo Decl. Ex. 2, at 26-27.

Potential foster parents are also required to demonstrate the ability to exercise sound judgment; responsible, stable, and emotionally mature behavior; and the physical and mental

capacity to care for a child or young adult.  Rizzo Decl. Ex. 2, at 34-36, 45-47; Ex. 16, at 3.

Applicants must provide requested medical reports from a health care professional or may be

required to complete an expert evaluation and authorize DHS to obtain a report from the evaluator.

Rizzo Decl. Ex. 16, at 3l; Ex. 2, at 49.

During the SAFE Study, Campbell disclosed that he had a conviction for DUII because he

had a reaction to medication he was taking and "was on an antidepressant that had a bad reaction

and caused suicidal behavior."  Rizzo Decl. Ex. 19, at 14.  Lemon did not inquire into the

medication, what Campbell was taking the medication for, or whether he was still taking it.  Rizzo

Decl. Ex. 2, at 65-66.  In his SAFE Study questionnaire, Campbell marked that he suffered from

high blood pressure, ulcer, depression, attention deficit disorder, developmental disability,

impaired sight, frequent headaches, and asthma.  Rizzo Decl. Ex. 2, at 93.  It is not clear whether

Lemon requested records from Campbell's medical or mental health providers.  Rizzo Decl. Ex.

2, at 47-49, 96; Ex. 20, at 6.  Lemon testified that she did not recall discussing Campbell's history

of suicide attempts or whether he was receiving mental health treatment, nor did Lemon request

an evaluation of Campbell.  Rizzo Decl. Ex. 2, at 47-49.

Certifiers are expected to obtain available police reports and use information from those

reports as part of a "comprehensive inquiry," and certifiers are not permitted to ignore such history.

Rizzo Decl. Ex. 17, at 2-4.  Lemon testified that she made a regular practice of obtaining available

police reports in certifying foster parent applicants.  Rizzo Decl. Ex. 2, at 17.  Police reports for

Campbell's DUII show that Campbell was arrested on July 28, 2010 after drinking Pepto-Bismol,

nail polish remover, and an entire bottle of Dramamine and the reports record bizarre statements

and behavior by Campbell.  Rizzo Decl. Ex. 20, at 5, 10.  Lemon did not recall if she sought out

the police reports or investigated the circumstances of Campbell's arrest.  Rizzo Decl. Ex. 2, at 41-

42, 94-97.  In her report, Lemon wrote that the DUII was the result of a reaction to medication and that Campbell "took care of that problem and there haven't been any other incidents or arrests." Rizzo Decl. Ex. 2, at 65; Ex. 19, at 4.

In April 2013, John Fitzgerald approached Lemon directly to express concerns about Campbell's mental health.  Rizzo Decl. Ex. 2, at 73.  Lemon was generally aware that the boys' family was concerned about Campbell's mental health issues, as well as incidents in which Campbell had discussed suicide with the boys and had raised inappropriate sexual subjects around them.  Rizzo Decl. Ex. 2, at 77-78.

On May 30, 2013, Lemon issued an emergency certification of Campbell as a foster parent to carry out the boys' immediate placement with Campbell.  Rizzo Decl. Ex. 2, at 60.  On July 17, 2014, Lemon and Turner signed the SAFE Study on Campbell.  Rizzo Decl. Ex. 19, at 13.  In the SAFE Study, Lemon noted that the boys' paternal family had withdrawn their support for Campbell as a foster parent but indicated that the reasons for that withdrawal were "unknown" to her, despite her contact with John Fitzgerald.  Mitchell Decl. Ex. 13, at 1; Rizzo Decl. Ex. 2, at 17-25, 46-47, Ex. 19, at 3. The concerns expressed by the boys' paternal grandfather were omitted from the SAFE Study.  Lemon affirmed that the contents of the SAFE Study were true and correct to the best of her knowledge.  Rizzo Decl. Ex. 19, at 13.

Lemon's responsibilities did not end with the SAFE Study and Campbell's certification. Lemon was required to assess whether Campbell could maintain conditions in the home to provide for the safety, health, and well-being of a child or young adult.  Rizzo Decl. Ex. 16, at 13; Ex. 2, at 34, 40.  This included a continuing duty to ensure the boys were safe in Campbell's home and to "conduct a home visit at a minimum of every 180 days to monitor, assure compliance, and confirm a safe environment with standards and Department expectations."  Rizzo Decl. Ex. 2, at

29; Ex. 16, at 54-55.   It is not clear whether Lemon ever visited the Campbell home after June 24, 2013.   Mitchell Decl. Ex. 13, at 4-5 (showing a home visit on June 24, 2013 with no further notations of home visits through Campbell's appointment as the boys' guardian on July 7, 2014); Rizzo Decl. Ex. 2, at 70-72; Ex. 19, at 16-17.   On August 23, 2013, Lemon learned that Campbell had used physical discipline on E.F., but she did not interview either child or visit the home.   Rizzo Decl. Ex. 2, at 71-72; Mitchell Decl. Ex. 13, at 5 (Lemon's notes record the report of physical discipline, but no home visit or interview with the children).

In sum, Lemon certified Campbell as a foster parent despite her personal knowledge of his history of abuse, his lack of financial resources and housing, his lack of parenting experience, his failure to complete the necessary training, and alarming information about his mental health and history of attempted suicide, including the circumstances surrounding his DUII.   The record indicates that these failures involved a substantial deviation from DHS's own SAFE requirements. Lemon did not conduct the required home visits, nor did she follow up on reports that Campbell has used inappropriate physical discipline on the boys.   These facts are sufficient to establish an objective risk of harm associated with A.F. and E.F.'s placement in Campbell's home and that Lemon was subjectively aware of facts that would have compelled the recognition of that harm by a reasonable official.[2]   On this record, therefore, the Court concludes that A.F. and E.F. have made a sufficient showing of deliberate indifference as to Lemon.

The Court likewise concludes that the boys' right to be protected from harm, whether considered under the special relationship or the state created danger exception was clearly

---

[2] Defendants frame A.F. and E.F's claims as a failure to follow through on statutory and regulatory obligations, but the crux of the claim is that Lemon was subjectively aware of the risk posed by Campbell or that a reasonable official in Lemon's position would have been aware of the risk.   Lemon's failure to follow her obligations as certifier is evidence of deliberate indifference for purposes of the boys' Fourteenth Amendment claims, rather than a claim in and of itself.

established at the time of Lemon's conduct. The Ninth Circuit's decision in *Henry A.* defined the contours of that right with specificity and found that the right was, even in 2012, sufficiently well established to bar the application of qualified immunity. Additionally, the Ninth Circuit's 2010 decision in *Tamas* established that a child's right to be free from harm encompasses "a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent." *Tamas*, 630 F.3d at 842. The Court, therefore, concludes that Lemon is not entitled to qualified immunity regarding the claims brought by E.F.

### C. Turner

Turner was the DHS supervisor responsible for overseeing Evans and Lemon. "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Henry A.*, 678 F.3d at 1003-04 (internal quotation marks and citation omitted). However, these claims may be predicated only on a supervisor's "own culpable action or inaction in the training, supervision, or control of his [or her] subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* (internal quotation marks and citation omitted).

Here, Turner worked closely with Evans on the boys' case. Evans kept Turner "apprised of all developments in the case," and followed Turner's directions. Rizzo Decl. Ex. 1, at 2-3. Turner knew that both A.F. and E.F. did not want to live with Campbell. Rizzo Decl. Ex. 3, at 32-33, 44. As discussed in the previous section, Turner was directly involved in the "unprecedented" effort to secure basic household items for Campbell to assist him in qualifying as a foster parent.

Turner also supervised Lemon's study of Campbell's home and approved Lemon's recommendation to certify Campbell as a foster parent. Rizzo Decl. Ex. 2, at 22-23; Ex. 3, at 7-8, 17-18. On July 17, 2013, Turner issued a certificate of approval to operate a DHS-certified foster home. Rizzo Decl. Ex. 19, at 1. In her deposition, Turner admitted that the SAFE Study she approved contained inaccuracies, specifically with regard to the family's concerns about Campbell. Rizzo Decl. Ex. 3, at 47-54. Like Evans and Lemon, Turner was also aware of Campbell's use of physical discipline in violation of DHS policy, but took no action beyond directing Evans to remind Campbell that physical discipline was prohibited. Rizzo Decl. Ex. 3, at 15-16, 17-21; *see also* Mitchell Decl. Ex. 12, at 3 (Turner "advised we will work with [Campbell] to identify new ways of discipline that do not involve spanking, and that we will work through some of these bumps along the way."). Turner was also aware of E.F.'s school's report to Evans concerning Campbell's behavior with the boys. Mitchell Decl. Ex. 19.

As discussed above, the record shows that Turner was closely and personally involved with both Evans's activities as the boys' caseworker and with Lemon's work as certifier for Campbell as a foster parent. This direct involvement is sufficient to subject Turner to liability under § 1983 and the Court concludes that A.F. and E.F. have made out violations of their due process rights against Turner for the same reasons as Evans and Lemon. And, as with Evans and Lemon, the Court concludes that the contours of the right were sufficiently well-established at the time of Turner's conduct that she is not entitled to the protections of qualified immunity regarding the claims brought by E.F.

## CONCLUSION

For the reasons set forth above, the Court concludes that the E.F.'s claims are timely. The Court has also concluded that the individual Defendants are not entitled to the protection of

qualified immunity.  The Court therefore GRANTS E.F.'s Motion for Partial Summary Judgment,

ECF No. 182, and DENIES Defendants' Motion for Partial Summary Judgment, ECF No. 185.

It is so ORDERED and DATED this __17th_____ day of September 2021.


　　　　　　　　　　　　　　　　 _/s/ Patricia Sullivan_____
　　　　　　　　　　　　　　　　 Patricia Sullivan
　　　　　　　　　　　　　　　　 United States Magistrate Judge